# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **ANTHONY L. COOK,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10cv00033 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Anthony L. Cook, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cook protectively filed his application for DIB on April 10, 2007, alleging disability as of October 13, 2005, due to lower back problems, anxiety, depression and Crohn's disease. (Record, ("R."), at 99-100, 103, 126.) The claim was denied initially and on reconsideration. (R. at 59-61, 65, 66-68, 70-72.) Cook then requested a hearing before an administrative law judge, ("ALJ"). (R. at 73.) The hearing was held on July 16, 2008, at which Cook was represented by counsel. (R. at 25-56.)

By decision dated August 28, 2008, the ALJ denied Cook's claim. (R. at 12-24.) The ALJ found that Cook met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2011. (R. at 14.) The ALJ also found that Cook had not engaged in substantial gainful activity since October 13, 2005, the alleged onset date. (R. at 14.) The ALJ found that the medical evidence established that Cook suffered from severe impairments, namely Crohn's disease, degenerative disc disease, status post on-the-job injury, depression and anxiety, but she found that Cook did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.) The ALJ also found that Cook had the residual

functional capacity to perform simple, routine, repetitive, unskilled light work[1] that required only occasional climbing, balancing, kneeling, stooping, crouching or crawling, that did not require exposure to hazardous machinery, unprotected heights, the climbing of ladders, ropes or scaffolds or working on vibrating surfaces and that required only occasional interaction with the general public. (R. at 18.) Thus, the ALJ found that Cook was unable to perform his past relevant work as a paving equipment operator, a truck driver, an assembler, a resident supervisor, a security guard, a sporting goods store worker and a door assembler. (R. at 22.) Based on Cook's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Cook could perform, including jobs as a clerical worker, a product packager and a laundry worker. (R. at 22-23.) Thus, the ALJ found that Cook was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. § 404.1520(g) (2011).

After the ALJ issued her decision, Cook pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 1-5.) Cook then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2011). The case is before this court on Cook's motion for summary judgment filed February 25, 2011, and the Commissioner's motion for summary judgment filed March 22,

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2011).

2011.

## *II. Facts*

Cook was born in 1975, (R. at 29, 99), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Cook has a high school education and completed a commercial driver's license program. (R. at 29, 134.) He has past work experience as an assembler, a laborer, a resident supervisor, a truck driver and an owner of a sporting goods store. (R. at 127.) He testified that medication helped with his panic attacks. (R. at 34.) Cook also stated that his medication helped his symptoms related to Crohn's disease. (R. at 35.)

Vocational expert, Leah Perry Salyers, testified at Cook's hearing. (R. at 45-55.) Salyers stated that Cook's past work as a paving equipment operator and laborer was classified as semiskilled, heavy[2] work. (R. at 47.) She classified Cook's past work as a truck driver as semiskilled, medium[3] work. (R. at 47.) Cook's assembly positions were classified as skilled, light work and unskilled, medium work; his job as a residential supervisor was classified as light and skilled; his job as a security guard was classified as unskilled, light work; and his job in the family sporting goods store was classified as unskilled, light to medium work. (R. at 47-48.)

---

[2] Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2011).

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2011).

-4-

Salyers was asked to consider an individual of Cook's age, education and past work experience and who retained the residual functional capacity to perform light work, who could occasionally climb, balance, kneel, crawl, stoop and crouch and who could not be exposed to hazardous machinery, unprotected heights, climbing ladders, ropes or scaffolds or work on vibrating surfaces. (R. at 48.) Salyer stated that such an individual could perform Cook's past work as a security guard. (R. at 49.) She also stated that there would be jobs available that existed in significant numbers that such an individual could perform, including light, unskilled clerical work, a telephone interview worker and cashier positions. (R. at 51.) Salyers was then asked to consider the same individual, but who could perform only simple, routine, repetitive, unskilled work that involved only occasional interaction with the public. (R. at 51.) She stated that there would be jobs available that such an individual could perform, including jobs as a clerical worker, a product packager and a laundry worker. (R. at 51-52.) Salyers was next asked to consider an individual who would be limited as indicated in the assessments of John W. Ludgate, Ph.D., and Dr. Dwight Bailey, M.D. (R. at 52, 471-73, 496-98.) She stated that there would be no jobs available that such an individual could perform. (R. at 53.) Salyers was asked to consider the first hypothetical individual, but who also was limited as indicated by the assessment of William B. Haynes, M.Ed., a licensed professional counselor. (R. at 53, 493-95.) She stated that such an individual would be precluded from performing gainful employment. (R. at 54.)

In rendering her decision, the ALJ reviewed medical records from Johnston

-5-

Memorial Hospital; Renaissance Surgery Center; Lebanon Physical Therapy and Rehabilitative Services, Inc.; Wellmont Bristol Regional Medical Center; Russell County Medical Center; Dr. Ken W. Smith, M.D.; Dr. Robert McGuffin, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. Thomas Phillips, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and John W. Ludgate, Ph.D., a licensed clinical psychologist. Cook's attorney also submitted medical reports from Ronald W. Brill, Ph.D., a psychologist and William Haynes Jr., M.Ed., a licensed professional counselor, to the Appeals Council.[4]

Cook participated in physical therapy for back pain from October 31, 2005, through March 30, 2006. (R. at 204-26.) On December 21, 2005, Cook stated that therapy had helped him, and he reported that his back was 50 percent back to normal. (R. at 208-09.) The physical therapist opined that Cook would have no difficulties returning to his driving job. (R. at 209.) On January 16, 2006, Cook stated that he could not return to his driving position because he could not function without his pain medication. (R. at 210.)

On January 19, 2006, Cook complained of low back pain. (R. at 300.) He was diagnosed with acute lumbar myofascial strain. (R. at 301.)

Treatment notes from Dr. Dwight L. Bailey, M.D., Shelley R. Miller, F.N.P.,

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

a family nurse practitioner, and Sandra M. Altenbach, F.N.P., a family nurse practitioner, from October 19, 2005, through May 9, 2008, show diagnoses of low back pain, degenerative disc disease, insomnia, anxiety, osteoarthritis of the ankle, depression and joint effusion of the left leg. (R. at 386-95, 416-27, 433, 436-41, 474-91, 496-98.) On November 1, 2005, an MRI of Cook's lumbar spine showed midline disc protrusions at the L3-L4 through L5-S1 levels and annular tears posteriorly at the L4-L5 and L5-S1 levels. (R. at 199, 339.) On February 20, 2007, Cook saw Miller for complaints of breaking out in sweats, chest pain and shortness of breath. (R. at 386.) He complained of experiencing up to three panic attacks a day. (R. at 386.) Miller reported that Cook had full range of motion of his back, and she diagnosed insomnia and anxiety. (R. at 386-87.) On March 20, 2007, Cook reported that his panic attacks were less frequent. (R. at 388.) He complained of low back pain that radiated into his right lower extremity. (R. at 388.) Miller reported that Cook had lumbar tenderness and muscle spasm with a limited range of motion. (R. at 389.) On April 20, 2007, Cook reported that his medications provided "significant benefit." (R. at 390.) He reported that his low back pain was constant and aggravated with movement. (R. at 390.) On April 30, 2007, Dr. Bailey reported that Cook was permanently and totally disabled. (R. at 378.) On July 13, 2007, Cook complained of leg pain and bilateral leg swelling. (R. at 422.) Cook reported that his symptoms of anxiety and depression were doing well, and he voiced no complaints. (R. at 422.) Cook reported a confused mood and sleep disturbance. (R. at 422.) Dr. Bailey reported that Cook had tenderness in his back and a limited range of motion. (R. at 422.)

On June 10, 2008, Sandra M. Altenbach, F.N.P., a family nurse practitioner, and Dr. Bailey completed a medical assessment indicating that Cook's ability to lift and carry items was not affected by his impairment. (R. at 496-98.) It was reported that Cook could stand and/or walk a total of two hours in an eight-hour workday. (R. at 496.) It was reported that Cook also was limited to sitting two hours in an eight-hour workday. (R. at 497.) Altenbach and Dr. Bailey reported that Cook could occasionally climb, kneel and balance and never stoop, crouch or crawl. (R. at 497.) No other limitations were noted. (R. at 497-98.) Altenbach and Dr. Bailey opined that Cook would be absent from work more than two days a month. (R. at 498.) On April 10, 2008, Cook reported that his anxiety was stable with medication. (R. at 476.)

On November 17, 2005, Cook saw Dr. Jim C. Brasfield, M.D., for evaluation of his work-related injury of October 13, 2005. (R. at 252-54.) Cook's knee and ankle reflexes were intact, and straight leg raising tests were negative. (R. at 253.) Dr. Brasfield reviewed Cook's lumbar MRI, which showed degenerative changes at the fourth and fifth levels of the lumbar spine. (R. at 253.) Dr. Brasfield diagnosed a lumbar strain. (R. at 253.) On November 29, 2005, a lumbar myelogram showed minimal disc protrusions at the L3-L4 and L4-L5 levels, which slightly accentuated some congenital narrowing. (R. at 255-56.) A CT scan of Cook's lumbar spine showed mild age-related facet disease bilaterally at all levels, congenital narrowing of the canal at the L3-L4 and L4-L5 levels accentuated by disc protrusions and posterior elemental hypertrophy. (R. at 257-58, 345, 347.) On December 12, 2005, Dr. Brasfield administered a lumbar epidural steroid injection.

(R. at 200-01.) On December 22, 2005, Dr. Brasfield released Cook to return to work driving a truck, but restricted Cook from any shoveling. (R. at 248.) On February 8, 2006, Dr. Brasfield performed a discography at the L3-L5 levels of the lumbar spine. (R. at 202-03.) On February 20, 2006, Dr. Brasfield noted that Cook had returned to work on January 17, 2006, as a light duty flagger. (R. at 263.) He noted that on January 19, 2006, Cook's mother called the office reporting that Cook was unable to work. (R. at 263.) However, Cook never called the office himself or scheduled an appointment to be seen. (R. at 263.) On April 3, 2006, Dr. Brasfield released Cook to return to work on April 5, 2006. (R. at 272.) Dr. Brasfield noted that Cook could not lift items weighing more than 15 pounds and that he could drive a truck for up to eight hours a day. (R. at 272.) On May 2, 2006, Cook reported that work activity caused severe discomfort for which he took more pain medication than prescribed. (R. at 233.) Dr. Brasfield took him out of work until he could get a second opinion. (R. at 233.) On July 11, 2006, Cook stated that he wanted to proceed with surgery. (R. at 227.) Dr. Brasfield reported that Cook should remain off work until he saw Dr. Victor Freund, M.D. (R. at 228.)

On June 22, 2006, Dr. Victor T. Freund, M.D., reported that Cook did not appear to be in any acute physiologic distress and did not seem depressed. (R. at 357.) He reported that Cook ambulated slowly but steadily. (R. at 357.) Cook had a markedly decreased range of motion of the lumbar spine. (R. at 357.) He had symmetric tone and bulk in the lower extremities, and straight leg raising tests were negative for leg pain, but positive for back pain bilaterally. (R. at 357.) Dr. Freund diagnosed lumbar degenerative disc disease at the L4-L5 and L5-S1 levels

with centralized disc protrusions at the L3-L4 through the L5-S1 levels; annular tears at the L4-L5 and L5-S1 levels; discogenic pain at the L4-L5 level with some pain at the L5-S1 level; and congenital stenosis of the lumbar spine. (R. at 358.) On October 31, 2006, an MRI of Cook's lumbar spine showed degenerative changes and narrowing of the canal at the L3-L4 and L4-L5 levels. (R. at 295-97.) On December 19, 2006, Cook was admitted for a lumbar discogram, which showed a disc extrusion with contrast above and below the level of the disc space at the L3-L4 level and findings consistent with disc protrusions at the L4-L5 and L5-S1 levels. (R. at 273-91.) On December 21, 2006, Dr. Freund reported that Cook had an antalgic gait. (R. at 360.) Cook had good strength and sensation in his lower extremities. (R. at 360.) Dr. Freund recommended that Cook remain out of work. (R. at 360.)

On January 12, 2007, William Haynes, M.Ed., a licensed professional counselor, saw Cook at the request of Cook's attorney for assessment and treatment of "mental emotional stress, secondary to back pain and recent back surgery." (R. at 383.) Haynes diagnosed major depression. (R. at 383.) On May 8, 2007, Cook complained of depression, secondary to back pain. (R. at 379.) Haynes reported that Cook continued to express signs of depression. (R. at 379.)

On June 5, 2008, Haynes completed a mental assessment indicating that Cook had a limited, but satisfactory, ability to follow work rules and to understand, remember and carry out simple instructions. (R. at 493-95.) He reported that Cook had a seriously limited ability to relate to co-workers, to deal with the public, to

-10-

use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed instructions, to maintain personal appearance and to relate predictably in social situations. (R. at 493-94.) Haynes reported that Cook had no useful ability to understand, remember and carry out complex instructions, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 493-94.) He opined that Cook would be absent from work more than two days a month. (R. at 495.)

On August 5, 2008, Cook complained of depression, secondary to chronic pain and loss of ability to work. (R. at 515.) He was diagnosed with a mood disorder due to chronic pain. (R. at 515.) On September 23, 2008, Cook complained of depression, secondary to chronic pain. (R. at 514.) Cook was diagnosed with a mood disorder due to chronic pain. (R. at 514.)

On March 30, 2007, Cook was seen at Blue Ridge Neuroscience Center, P.C., for complaints of lumbar pain, bilateral hip pain and right lower extremity pain and numbness. (R. at 328-32.) Dr. Ken W. Smith, M.D., diagnosed lumbar degenerative disc disease at the L4-L5 and L5-S1 levels, low back pain and muscle spasm over the posterior thoracic region. (R. at 331.) On April 9, 2007, Cook reported situational depression, secondary to his recent injury and sleep disturbance due to ongoing symptoms. (R. at 334.) Dr. Smith diagnosed lumbar degenerative disc disease at the L4-L5 and L5-S1 levels, low back pain, failing to improve, and muscle spasm over the posterior thoracic region. (R. at 335.) He

reported that Cook was unable to return to work. (R. at 335.)

On July 13, 2007, Dr. Robert McGuffin, M.D., a state agency physician, reported that Cook had the residual functional capacity to perform light work. (R. at 396-402.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 398-99.)

On July 13, 2007, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Cook suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 403-15.) Perrott reported that Cook had no limitations in his ability to perform activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 413.) He also reported that Cook had not experienced any episodes of decompensation. (R. at 413.)

On October 29, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF indicating that Cook suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 442-55.) Leizer reported that Cook had no limitations in his ability to perform activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 452.) He also reported that Cook had not experienced any episodes of decompensation. (R. at 452.)

On October 30, 2007, Dr. Thomas Phillips, M.D., a state agency physician,

-12-

reported that Cook at the residual functional capacity to perform light work. (R. at 456-62.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 358-59.)

On April 10, 2008, John W. Ludgate, Ph.D., a licensed clinical psychologist, evaluated Cook at the request of Cook's attorney. (R. at 463-70.) Ludgate reported that diagnostic interviewing revealed diagnoses of major depression, generalized anxiety disorder and panic disorder, in partial remission. (R. at 469.) Psychological testing revealed significant scores on depression, somatization and anxiety. (R. at 469.) Testing for malingering showed no evidence of any malingering tendencies. (R. at 469.) Ludgate reported that Cook's psychiatric and medical problems experienced since his injury precluded him from working. (R. at 469-70.)

Ludgate completed a mental assessment indicating that Cook had a limited, but satisfactory, ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance and to demonstrate reliability. (R. at 471-73.) He reported that Cook had a seriously limited ability to relate to co-workers, to use judgment, to interact with supervisors, to understand, remember and carry out detailed instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 471-72.) Ludgate also reported that Cook had no useful ability to deal with the public, to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out complex instructions. (R. at 471-72.) He opined that Cook would be absent from work more than two days a

-13-

month. (R. at 473.)

On January 8, 2009, Ronald W. Brill, Ph.D., a licensed clinical psychologist, evaluated Cook at the request of Cook's attorney. (R. at 503-06.) Brill reported that Cook's attention, concentration and memory functions were impaired. (R. at 504.) Cook's mood appeared depressed and anxious. (R. at 504.) Cook reported that his panic attacks were reasonably controlled with medication. (R. at 504.) Brill diagnosed chronic major depressive disorder, single episode, severe without psychotic features, and an adjustment disorder with mixed anxiety and depressed mood. (R. at 505.) Brill reported that Cook had a then-current Global Assessment of Functioning score, ("GAF"),[5] of 50,[6] with his highest GAF score being 50 during the previous year. (R. at 505.)

Brill completed a mental assessment indicating that Cook had a limited, but satisfactory, ability to follow work rules, to understand, remember and carry out simple instructions and to maintain personal appearance. (R. at 507-09.) He reported that Cook had a seriously limited ability to relate to co-workers, to interact with supervisors and to function independently. (R. at 507-08.) Brill also reported that Cook had no useful ability to deal with the public, to use judgment, to deal with work stresses, to maintain attention and concentration, to understand,

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.)

[6] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-14-

remember and carry out complex and detailed instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 507-08.) He opined that Cook would be absent from work more than two days a month. (R. at 508.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1250(a) (2011).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See*

-15-

*Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Cook argues that the ALJ's residual functional capacity finding is not supported by substantial evidence. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-18.)

The ALJ found that the medical evidence established that Cook suffered from severe impairments, namely Crohn's disease, degenerative disc disease, status post on-the-job injury, depression and anxiety, but she found that Cook did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.) The ALJ found that Cook had the residual functional capacity to perform simple, routine, repetitive, unskilled light work that required no more than occasional climbing, balancing, kneeling, stooping, crouching or crawling, that did not require exposure to hazardous machinery, unprotected heights, the climbing of ladders, ropes or scaffolds or working on vibrating surfaces and that required only occasional interaction with the general public. (R. at 18.)

Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's finding with regard to Cook's mental residual functional capacity. As noted above, the ALJ limited Cook to simple, unskilled light work that did not require more than occasional interaction with the general public. (R. at 18.) While Cook did report that medication helped with his panic attacks and symptoms of anxiety and depression, Haynes, Ludgate and Brill still placed a number of limitations on his work-related abilities. (R. at 493-95, 463-70, 503-06.) In April 2008, psychological testing showed that Cook obtained

significant scores on depression, somatization and anxiety. (R. at 469.) Testing for malingering showed no evidence of any malingering tendencies. (R. at 469.) Ludgate opined that Cook's psychiatric and medical problems precluded him from working. (R. at 469-70.) Based on these findings, numerous limitations were placed on Cook's work-related mental abilities. The ALJ stated that she was not giving Haynes's and Ludgate's opinions great weight because they were not supported by the record. (R. at 16, 22.) She also stated that Ludgate was not a source that had an established longitudinal history of treatment. (R. at 16.) The ALJ issued her decision in August 2008, and psychologist Brill saw Cook in January 2009 and diagnosed major depressive disorder and an adjustment disorder with mixed anxiety and depressed mood. (R. at 505.) Brill also assessed Cook's then-current GAF score at 50, with his highest GAF score being 50 within the previous year. (R. at 505.) In addition, Brill placed a number of limitations on Cook's work-related mental abilities very similar to those placed on him by Haynes and Ludgate. (R. at 507-09.) The ALJ did not have Brill's report before her at the time of her decision. Furthermore, the vocational expert testified that if an individual was limited as indicated by Haynes's assessment, there would be no jobs available that such an individual could perform. (R. at 53.) Therefore, I cannot determine that substantial evidence exists to support the ALJ's finding with regard to Cook's mental residual functional capacity.

I also do not find that substantial evidence exists to support the ALJ's finding with regard to Cook's physical residual functional capacity. The ALJ found that Cook had the residual functional capacity to perform simple, routine, repetitive, unskilled light work that required no more than occasional climbing, balancing, kneeling, stooping, crouching or crawling, that did not require exposure

-17-

Case 1:10-cv-00033-JPJ-PMS   Document 21   Filed 10/25/11   Page 17 of 20   Pageid#: 620

to hazardous machinery, unprotected heights, the climbing of ladders, ropes or scaffolds or working on vibrating surfaces. (R. at 18.) The ALJ noted that she was not giving great weight to Dr. Bailey's opinion that Cook was totally and permanently disabled. (R. at 21.) She also noted that she was not giving great weight to the opinions of Drs. Freund and Smith because they "are not borne out by the evidence of record as a whole." (R. at 21.) It appears that the ALJ based her interpretation of the medical reports on Dr. Brasfield permitting Cook to attempt to return to work. (R. at 19.) However, Cook's attempts to return to work were not successful, and Dr. Brasfield took him off work completely. (R. at 233.) Dr. Brasfield's decision was subsequently adopted by both Drs. Freund and Smith. (R. at 335, 360.) Their conclusions were based upon their clinical findings and diagnostic tests, which included restricted range of motion, muscle spasm and positive discography. (R. 331, 334, 357, 360.) Based on this, I do not find that substantial evidence exists to support the ALJ's finding with regard to Cook's physical residual functional capacity.

It is for all of these reasons that I find that substantial evidence does not exist to support the ALJ's finding with regard to Cook's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the Commissioner's finding with regard to Cook's mental residual functional capacity;

-18-

2. Substantial evidence does not exist to support the Commissioner's finding with regard to Cook's physical residual functional capacity; and

3. Substantial evidence does not exist to support the Commissioner's finding that Cook was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's and Cook's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for further consideration.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.
>
> Failure to file timely written objections to these proposed findings and

recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: October 25, 2011.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE